


**FILED**

OCT 2 0 2008

CLERK

# UNITED STATES DISTRICT COURT

# DISTRICT OF SOUTH DAKOTA

## CENTRAL DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| BARBARA L. DEWALD, | CIV. 07-3036-CBK |
| Plaintiff, | |
| -vs- | REPORT AND RECOMMENDATIONS FOR DISPOSITION OF JUDICIAL REVIEW IN SOCIAL SECURITY CASE |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | |
| Defendant. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The above-captioned Social Security case was referred to this Court by the District Court[1] pursuant to 28 U.S.C. §636(b) for the purpose of conducting any necessary hearings[2] and submitting to it proposed findings of fact and recommendations for disposition of the case. Docket No. 10. After careful scrutiny of the record and based on the totality of the circumstances present, the Court does now make and propose the following findings of fact, report and recommendations for disposition.

### I.

On October 21, 2003, Plaintiff, Barbara L. Dewald ("Dewald") filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§401-433, 1381-1383c. AR 54-57, 277-

---

[1]The Honorable Charles B. Kornmann, United States District Judge, presiding.

[2]No hearings were held because none were needed to decide the case at this juncture.

79[3] (citations to the appeal record will be made using the letters "AR" followed by the relevant page(s) in the record). The Social Security Administration ("SSA") denied her claims initially and on reconsideration. AR 32-34, 39-41.

Dewald then requested, and was given, an administrative hearing before an administrative law judge ("ALJ") on October 26, 2005. AR 331-59. The ALJ issued an unfavorable decision on December 12, 2005, finding that Dewald was not disabled within the meaning of the Act. AR 300. In doing so, the ALJ found that Dewald had met the non-disability requirements for a period of disability and DIB benefits through March 31, 2003 and that she had not engaged in substantial gainful activity ("SGA") at any time since June 30, 2000. AR 293. The ALJ, however, found that Dewald did not have any medically established impairment or combination of impairments that significantly limited (or were expected to significantly limit) her ability to perform basic work-related activities for 12 consecutive months and that as such, she did not have a "severe" impairment or combination of impairments within the meaning of the Act. AR 294. Accordingly, the ALJ ended his sequential disability evaluation process at "step two"[4] and found that Dewald was not

---

[3]Dewald previously applied for DIB on August 31, 2000, AR 51-53, but that claim was denied on November 17, 2000, AR 28-31, and was not appealed.

[4]The SSA has established a five-step sequential evaluation process for determining disability. 20 C.F.R. §§404.1520(a), 416.920(a). A set order is followed and if it is determined that a claimant is or is not disabled prior to the last step of the evaluation process, consideration of the remaining steps is not required. §§404.1520(a)(4), 416.920(a)(4).

The first step is to determine whether the claimant is engaging in SGA. §§404.1520(a)(4)(i), 416.920(a)(4)(i). SGA is defined as work activity that is both substantial and gainful. §§404.1572, 416.972. An individual is engaging in substantial work activity if she is doing significant physical or mental activities. §§404.1572(a), 416.972(a). Gainful work activity is work usually done for pay or profit, whether or not profit is in fact realized.

(continued...)

2

[4](...continued)
§§404.1572(b), 416.972(b).  Generally, if a claimant has earnings from employment or self-employment above a specific level set out in the Social Security regulations, it is presumed that she has demonstrated the ability to engage in SGA.  §§404.1574, 404.1575, 416.974, 416.975.  If the claimant engages in SGA, she is not disabled regardless of how severe her physical or mental impairments are.  §§404.1520(a)(4)(i), 416.920(a)(4)(i).  On the other hand, if the claimant is not engaging in SGA, the analysis proceeds to the second step.

At step two, a determination must be made as to whether the claimant has a medically determinable "severe impairment" or a combination of impairments that is severe. §§404.1520(a)(4)(ii), 416.920(a)(4)(ii).  An impairment is "severe" within the meaning of the regulations if it imposes significant restrictions upon a claimant's ability to perform basic work activities.  §§404.1520(c), 416.920(c).  An impairment or combination of impairments is "not severe" and a finding of "not disabled" is made at this step when medical evidence establishes only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on the claimant's ability to work.  §§404.1521, 416.921; Social Security Rulings ("SSR") 85-28 and 96-3p.  If a medically severe combination of impairments exist, the combined impact will be considered throughout the disability determination process, even those that are not severe.  §§404.1523, 416.923; SSR 86-8.  If the claimant has a severe impairment(s) or a combination of impairments, the analysis proceeds to the next step.

The third step is to determine whether the claimant's impairment(s) meets or medically equals the criteria listed in 20 C.F.R. Part 404, Subpart P of Regulations No. 4. §§404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If so, and the durational requirements found in §§404.1509 and 416.909 are met, the claimant is disabled.  §§404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If not, the sequential process continues.

Before considering the fourth step of the process, the claimant's residual functional capacity ("RFC") must first be determined, §§404.1520(a)(4)(iv), 416.920(a)(4)(iv).  A claimant's RFC is her ability to do physical or mental work activities on a sustained basis despite limitations from her impairments.  §§404.1545, 416.945.  In making this finding, consideration must be given to the claimant's impairments, including impairments that are not severe. §§404.1520(a)(4)(iv), 404.1545(a)(2), 416.920(a)(4)(iv), 416.945(a)(2); SSR 96-8p.

At step four, it must be determined whether the claimant has the RFC to perform the requirements of past relevant work ("PRW").  §§404.1520(a)(4)(iv), 416.920(a)(4)(iv).  PRW means work performed, either actually as the claimant performed it or as it is generally performed in the national economy, within the last 15 years or 15 years prior to the date that disability must be established.  §§404.1560(b), 416.960(b).  In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA.  §§404.1560(b), 404.1565, 416.960(b), 416.965.  If the claimant has the RFC to do her past relevant work, she is not disabled.  §§404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If, however, the claimant is unable to do PRW, the analysis proceeds to the fifth and final step.

At this step, the claimant's impairments are considered and a determination is made as to whether she is able to do any other work.  §§404.1520(a)(4)(v), 416.920(a)(4)(v).  Although the claimant generally must shoulder the burden of proving disability at this step, a limited burden shifts to the SSA to provide evidence that demonstrates other work exists in significant numbers in the national economy that the claimant can do, given her RFC, age, education and work

(continued...)

"disabled" within the meaning of the Act on and after June 30, 2000.  AR 292-300.

Upon Dewald's request for review, Docket No. 14-3[5], the SSA's appeals council remanded the case to the ALJ on March 1, 2007 because the tape recording of the hearing testimony was missing and the council did not have the complete record to review, AR 309-12.  The appeals council subsequently vacated its remand order on July 13, 2007, when the missing tape recording was located.  AR 12-14.  On August 24, 2007, the appeals council found no basis for changing the ALJ's decision, AR 8-11, thereby making this decision the final decision of the Commissioner.  See 20 C.F.R. §404.981 (2007).[6]

On October 22, 2007, Dewald filed a Complaint in federal court, seeking review of the Commissioner's denial of DIB and SSI benefits under 42 U.S.C. §§405(g) and 1383(c)(3).  Docket No. 1.  After Defendant, Michael J. Astrue ("Commissioner"), filed an Answer to the Complaint, Docket No. 7, the District Court ordered that the parties submit briefs on all issues, Docket No. 9, which they have done, Docket Nos. 14, 17, 18.  Thereafter, the Court referred the case to this Court, Docket No. 10, and Dewald moved for summary judgment, Docket No. 12.

## II.

Dewald was born on January 11, 1948, making her one month shy of 58 years at the

---

[4](...continued)
experience.  §§404.1560(c), 416.960(c).

[5]A review of the administrative record reveals that page 305 of the same is missing. Dewald has included pages 305 and 306 as attachments to her opening brief, which pertain to her request to the appeals council for review of the ALJ's decision/order

[6]All references to the Code of Federal Regulations ("C.F.R.") in this Report are to the 2007 edition to the Regulations.

4

time the ALJ rendered his decision. AR 54, 300, 336. She dropped out of high school in 1966, obtained her GED 10 years later and attended one year of college in 1984. AR 72. She also received training as a cosmetologist and a nurse's assistant between 1984 and 1994. Id. She worked as a census taker, waitress, nurse's aide and laborer. AR 80-91, 139. The ALJ determined that Dewald had not engaged in SGA on and after June 30, 2000, but not prior thereto, AR 293, and this finding has not been challenged. Accordingly, the earliest possible disability onset date, for Dewald, is June 30, 2000.

The medical and mental health evidence before the ALJ came from several different healthcare practitioners. The salient findings, conclusions and observations made and noted by these practitioners are discussed below.

## A.

Dewald was first treated by Dr. Gary Van Ert on June 13, 2000 for episodes of vision loss, with numbness and tingling of the left extremity which she reported had occurred on June 6 and 9, 2000. AR 190-91. Dr. Van Ert examined her, without noting any abnormalities, and referred her to Dr. Warren Opheim, a Sioux Falls neurologist. AR 190. Dr. Van Ert's assessment was "[p]robable TIA's (Transient Ischemic Attack - a "mini stroke"), with hemianopsia (loss of vision). Id.

## B.

Dewald was then admitted to Avera McKennan Hospital where Dr. Opheim treated her from June 13 to 15, 2000. AR 140-58. A number of tests were performed, which Dr. Opheim found to be unremarkable. AR 140. Dewald was placed on Aggrenox and did not have any recurrent symptoms. Id. Dr. Opheim did, however, still question whether Dewald's

symptoms were attributable to a posterior fossa ischemia (loss of blood supply to the intracranial cavity) and ordered a hypercoagulation panel (blood clotting test).   Id.   The results of this panel were not available at the time of Dewald's discharge and are not a part of the appeal record.

C.

There is no evidence that Dewald sought or received any medical care between June 16, 2000 and October 10, 2003, a period of over three years. On October 11, 2003, Dewald was hospitalized at Mid-Dakota Hospital in Chamberlain after she complained of abdominal and back pain "over the past few months." AR 159-81. There, Dewald was treated by Dr. John McFee who, after examining her and reviewing her test results, diagnosed her with (1) urinary tract infection pyelonephritis (kidney infection); (2) gastritis (inflammation of the stomach lining); (3) abdominal pain – other etiologies to be determined; (4) old cerebralvascular accident; (5) cerebral arteriosclerosis (blockage of the arteries in the brain); (6) strain of lumbralsacral spine (low back strain); (7) degenerative arthritis of lumbar spine; and (8) trichomonas vaginitis (vaginal infection). AR 160. Dr. McFee's prognosis was "[g]uarded pending further evaluation on an outpatient basis." Id.

Dr. McFee noted that Dewald "had a cerebralvascular accident (CVA) in the past two or three years . . . ." AR 161. He also noted that there was evidence of dyslipidemia (elevation of blood lipids), by virtue of Dewalds's low HDL (high-density lipoprotein), which "may reveal one of the reasons as to why [she] may have had a cerebralvascular accident." AR 159. Significantly, Dr. McFee made reference in his discharge summary to Dewald's mentation being "a bit off", a symptom that he believed was "certainly consistent

6

with an old cerebralvascular accident." Id. He also made reference in the summary to Dewald having "trouble concentrating and thinking straightly." Id.

Dewald's lumbar x-rays showed that her bones "may be mildly demineralized" and that there "may be some very minimal anterior wedging of T-11" which should be correlated with her pain complaints. AR 178. In his discharge summary, Dr. McFee noted that Dewald's lumbar x-rays "showed degenerative changes." AR 159. His physical examination, upon her admission, revealed that Dewald had pain and limited motion of her lumbar spine. AR 161-62.

Dr. McFee saw Dewald on a follow-up basis at his clinic on October 20, 2003. AR 189. At that time, Dewald's urinary tract infection – pyelonephritis condition had improved, but the other diagnoses, made by Dr. McFee six days earlier, remained the same. Id. In his medical note, Dr. McFee again made mention of Dewald having back pain and "some limitation of motion of the lumbar spine" and of her mentation being "a bit off perhaps." Id. He continued her on Prevacid and Darvocet and gave her Augmentin to take. Id.

On November 4, 2003, McFee saw Dewald in his clinic "for follow-up of her back pain." Id. Dewald reported having intermittent pain to her back and right upper abdomen and upon examination, Dr. McFee noted "some questionable CVA tenderness." Dr. McFee's assessment of Dewald's condition changed to (1) urinary tract infection – improved; (2) cerebral arteriolosclerosis with cerebral ischemia; (3) possible old cerebral vascular accident; (4) coronary artery disease; (5) dyslipidemia; (6) osteoarthritis (degenerative arthritis) in the lumbar spine; and (7) gastritis. AR 189. He continued the previously prescribed medications and ordered an ultrasound of her abdomen. AR 188-89.    •

7

On December 5, 2003, Dr. McFee completed a long-term care disability report in which he provided diagnoses and work limitations. AR 184-85. Two of the diagnoses contained in his report were mental impairment – i.e., diminished mental capacity and chronic painful back extremities. AR 184. He noted that Dewald's condition had lasted, or could be expected to last, for a continuous period of one year, that her condition limited her ability to work and that she should only stand, walk, climb, kneel, crouch, crawl and stoop for durations of 10 minutes at a time. Id. In addition, he noted that Dewald had a lifting and carrying restrictions of 10 pounds. AR 185. As for her mental abilities, Dr. McFee stated that she could not "comprehend enough to fill out a simple form – needs help" and that she has had "trouble since her 'CVA' in 2000." Id.

### D.

On September 19, 2004, Dewald was hospitalized at Mid-Dakota Medical Center in Chamberlain, South Dakota, for debilitating back and neck pain, headache and inability to care for herself. AR 244-45. Her condition had deteriorated to the point where she was bed ridden and had to be brought to the emergency room in a wheelchair. AR 245. Dr. John B. Jones treated Dewald and noted a past medical history of arthritis "with a lot of pains, nephrolithiasis (kidney stones), urinary tract infections and an episode in the year 2000, where 'she would lose her ability to speak and get confused.'" Id. Upon examination, Dr. Jones reported that Dewald had "burning pain in the top of her head", had "some episodes where she [was] confused and ha[d] trouble [ ] making words, etc." Id. Dr. Jones also reported that Dewald had pain in her arms, with her right hand "being really cold a lot of the time", had episodes of throbbing in her fingertips and pain in her shoulders, across the upper

8

back, had leg weakness and pain, and pain in her lower back and hips. AR 246. In addition, Dr. Jones noted that she had episodes "a few years ago" that involved loss of speech and confusion "where she was not able to see where she was going or know what she was doing" and her being "quite tender to palpation along the paraspinous musculature (the muscles that surround vertebrae and disks of the back) and weak pulses in all four extremities." Id.

Lumbar x-rays were again taken and the same showed a "partial narrowing of the T-11 vertebral body of indeterminate age and some degenerative changes." AR 244. Dr. Jones prescribed Elavil, Naprosyn, Prevacid, Neurotin, Flexeril and Advair during her hospital stay. Id. When she was discharged the next day (September 20, 2004), her pain had "markedly improved." Id. Dr. Jones' prognosis for her, however, was "[p]oor." Id.

About 10 months later, on July 11, 2005, Dr. Jones again treated Dewald, this time for severe rectal pain and "some bleeding." AR 253. She was diagnosed with multiple hemorrhoids (swelling and inflammation of veins in the rectum and anus), which required surgery. AR 257. During a pre-surgery examination performed at Mid-Dakota Clinic, Dr. Regg Hagge noted Dewald's history of back, hip and leg pain, AR 260, and that she had a "very slow, deliberate speech pattern in which she ha[d] to search for words at times" and that she had "a little bit of a slur in her speech, AR 259. Although she denied being depressed, Dr. Hagge's impression included "[p]robable depression." AR 259-60.

E.

Dr. Walter O. Carlson, an orthopedic surgeon, saw and treated Dewald in Mitchell, South Dakota, on October 19, 2005. AR 270. Dewald had been referred by Dr. Jones based on low back and leg pain for approximately three years and pain in "the areas of each of her

9

trochanters [thigh bone]." Id. Dr. Carlson diagnosed her with having "trochanteric bursitis (inflammation of the hip) on the right and left sides" and noted that "[h]er leg pain [wa]s concerning." Id. He ordered an MRI (magnetic resonance imaging) scan, CBC (complete blood count) test, sedementation rate (a common blood test used to detect inflammation in the bond), bursitis injections (anti-inflammatory injections) for her right and left trochanteric and Darvaset. Id. The CBC results for MCH (mean corpuscular hemoglobin) and PLT (platelets) were outside of the normal range. AR 276. The appeal record, however, does not include her MRI results.

F.

At the request of the state agency evaluating her disability claims, Dewald was seen by Dr. Karen S. Wiemers, a licensed psychologist, to assess "problems with concentration and comprehension related to [Dewald's] CVA in 2000." AR 195. Dr. Wiemers performed an intake interview of Dewald and administered the Weschsler Adult Intelligence Scale – 3rd Edition (WAIS-III) and Weschsler Memory Scale – 3rd Edition (WMS-III), and Trails A & B Tests. AR 195-98.

Throughout the intake interview, Dr. Wiemers noted that Dewald "appeared quite uncomfortable" holding her side, shifting her weight frequently and grimacing as if in pain. AR 195. Dr. Wiemers also noted that Dewald had a tangential, rambling conversational style and had difficulty finding "the words she wanted to use." AR 196. Dewald reported having memory and orientation problems while shopping. Id.

Dewald scored in the average/normal range in the WAIS-III, WMS-III and Trails A tests. AR 197-98. Her scores in the Trails B test, however, fell within the "impaired range",

10

suggesting "the possibility of neuropsychological difficulties." AR 198.

In her diagnostic impressions, Dr. Wiemers ruled out somatization disorder[7] (in the absence of clear medical evidence) and borderline, histrionic, dependent personality disorder. Id. She concluded, however, that Dewald's history of abuse and lack of support system may have resulted in the internalization of psychological issues, possibly causing some somatization. AR 199. Dr. Wiemers added that it was not clear whether Dewald's tangential communication style and word finding problems were related to emotional or personality disorder issues or neurological problems. AR 199. Although Dewald's intellectual and memory testing did not indicate a disability, Dr. Wiemers believed that the results from the Trails B test "may suggest [a] neuropsychological component that may consequate into a disability" and recommended that a neuropsychological assessment be done. Id.

G.

On March 23, 2004, state agency psychologist, Dr. D.J. Soule, reviewed Dewald's medical records, including Dr. Wiemers' report, and determined that Dewald had non-severe somatoform and personality disorders. AR 200. In Dr. Soule's opinion, these disorders produced no restriction of activities of daily living or difficulties in maintaining social functioning, but did produce "mild" difficulties in maintaining concentration, persistence or pace and one or two episodes of decomposition of extended duration. AR 210. Subsequently, on September 2, 2004, a second state agency psychologist, Dr. Jerome

---

[7] A somatoform disorder is an involuntary condition where a person experiences pain or physical symptoms for which there are no demonstrable organic findings or known psychological mechanisms. See 20 C.F.R. Pt. 404, Subpt. P. App. 1, Pt. A §12.07

11

Buchkoski, reviewed Dewald's medical records and reached the same conclusions. AR 222, 232. Dr. Buchkoski noted that according to Dr. Wiemers' report, Dewald indicated that she had a lot of pain, but was able to perform activities of daily living if the pain was not too bad, that she denied having problems sleeping, yet alleged sleep problems in her disability report, that she was able to manage money, and that she had a history or non-compliance with medical treatment. AR 234.

On April 19, 2004, state agency physician, Dr. Kevin Whittle, completed a physical residual functional capacity assessment, based on Dewald's medical records, and concluded that she had no exertional, postural, manipulative, visual, communicative or environmental limitations. AR 214-18. In Dr. Whittle's opinion, Dewald was "self limited" and her pain was disproportionate to the "expected severity or duration" of her "medically determinable impairment(s)." AR 219. A second state agency physician, Dr. F.R. Entwistle, likewise reviewed Dewald's records on September 3, 2004, and reached the same conclusions in his assessment. AR 236-43.

H.

Dewald attached additional evidence to her federal court brief, consisting of an affidavit executed by Dr. Jones on June 9, 2007 (more than 18 months after the ALJ's decision) and an affidavit signed by her prior counsel stating that counsel mailed Dr. Jones' affidavit to the appeals council "by US Mail" on June 12, 2007. Docket No. 14-2. In his affidavit, Dr. Jones stated that he provided medical treatment to Dewald "on a continuing basis" and that prescribed medications had "not controlled her pain so that she is able to engage substantially in activities of daily living." Id. He noted that she had particular trouble

12

standing for long periods of time and also bending over.  In Dr. Jones' opinion, due to her ongoing pain, she would be unable to return to her prior work on a full-time basis or any other occupation.  Id.

III.

A.

In a questionnaire completed on or about October 13, 2003, Dewald reported that she could not sleep through the night, that doing dishes, cooking and cleaning the house had been very difficult, and that her friend and roommate, James E. Nickels, drove her to town to get things she needed.  AR 108.  She also reported that Nickels or her sister, Peggy Case, helped with household chores that she was supposed to do (in exchange for room and board), but at times could not do, that she used the computer to help her with concentration and hand problems, that she had trouble following directions, that she took extra strength non-aspirin for pain and that she was unable to stand for long durations because of stomach, spine, hand and head pain.  AR 109-10.

B.

Case completed a third party function report on November 29, 2003 in which she corroborated Dewald's complaints of pain.  AR 113-21.  In her report, Case stated that Dewald had trouble taking care of herself, that it was hard for Dewald to do the "simplest things", that it was difficult for Dewald to hold her arms up and that problems with her hands and arms limited her from doing a lot of regular things.  AR 114.  Case also reported that it was hard for Dewald to keep her mind on what she was trying to do, that due to hand, arm, leg and back pain, it was difficult to do household chores, that Dewald seemed to have pain

13

"everywhere" and was always taking aspirin for her pain, and that she had trouble lifting, bending, reaching, talking, with her memory, using her hands, completing tasks, concentrating, understanding and getting along with others. AR 115, 118. Case further reported that Dewald was not able to "handle stress at all", would call crying because she was in so much pain, that her mental state was bad, and that her pain kept getting worse all the time. AR 119-20.

### C.

Nickels completed his own third party function report on December 1, 2003 in which he stated that Dewald was not able to lift or work as hard as before, that her concentration and memory problems prevented her from doing many tasks effectively, that pain in her arms would wake her up at night, that the pain in her spine would make it difficult to care for her hair, that she had memory problems, that she was only able to do household chores in small amounts at a time, and that she was not able to do any heavy lifting or scrubbing. AR 123-24. Nickels likewise reported that he took her to town and helped her with her shopping because of pain and memory concentration problems, that she oftentimes needed someone to accompany her, especially on her "bad days", that she had problems lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, seeing, with her memory, stair climbing, using her hands, completing tasks, concentration, understanding, following instructions and getting along with others. AR 125-27. Moreover, he reported that walking about 100 yards was all that she could do without needing a rest, that if she went shopping, she would have to rest most of the next day, that she would totally lose her thoughts during conversations, that she had problems with comprehending most written

14

instructions, that instructions had to be repeated and done so slowly, that she was stressed easily, that stress created anxiety and pain for her and that she was fearful of her condition(s) getting worse. AR 127-28.

D.

In August, 2007, the appeals council received and considered a letter from Dewald's daughter, Jodi Warner. AR 11, 330. In her letter, Warner stated that Dewald had not been the "same person" since her strokes in 2000. AR 330. According to Warner, the strokes affected both Dewald's mind and body, making it frustrating at times to have a conversation with her, remember things, diminishing her physical abilities, such as holding scissors, walking, doing dishes, crafts, playing the organ, gardening, fishing, dancing, and doing the most simplest tasks. Id. Warner reiterated that the pain in Dewald's legs and back made it almost impossible to walk through a store and that Dewald's reliance on others to get around or do things for her was frustrating and brought her morale down. Id.

IV.

Dewald began her testimony by stating "I don't understand a thing he said, but okay" referring to the ALJ's opening remarks. AR 336. The ALJ did not respond at all to this statement and proceeded to place her under oath. Id.

When asked to think back to March 31, 2003 (her date of last insurance), Dewald responded by saying "I don't know that date." Id. She then testified that she was 57 years of age at the time and that she lived in Lower Brule, South Dakota, but did not know for how long. AR 336-37.

15

Dewald testified that her last job was a cook at the Golden Buffalo Restaurant a couple of years ago. AR 337-38. She thought that she worked there and got "a couple of paychecks" and that she was paid every two weeks. AR 345-46. When the ALJ asked her how the job ended, Dewald said "I couldn't think. I could not get that stupid recipe in my head and that (INAUDIBLE) didn't like it." AR 346. Dewald then added "I couldn't – I – I mean, after making all the time I was supposed to know how to do it and I – (INAUDIBLE)." Id. In response to questioning by the ALJ, Dewald testified that she had learned how to cook in [m]y mom's restaurant and my sister's restaurant" but she could not do it at the Golden Buffalo. AR 346-47. Again, the ALJ asked how her job ended, and Dewald related how she could not prepare a prime rib for someone. Id. When the ALJ asked if she quit her job or was let go, Dewald said that she quit because she could not do it and had not worked since then at all. Id.

Dewald testified that she was currently working as a housekeeper for Nickels. AR 338. She explained that he did not pay her, but let her live in his house with him in return for her taking care of cleaning, laundry, cooking, etc. AR 348. She said that she was not able to do the things that she was supposed to do around the house and that Nickels "just took over everything." AR 348-49. She went on to say that Nickels helped her in a number of ways: (1) reminding her to turn off the stove and deep fryer and that frozen foods went in the freezer and not the cupboard, AR 341-42; (2) giving her directions back to the house, id.; (3) assisting her with the housework, shopping and cooking, AR 343-44; (4) checking up on her several times a day when she was having a hard time, AR 344-45; and (5) mapping out her census routes when she worked for the Census Bureau following her stroke, AR 349-50.

16

With respect to her medical impairments, Dewald testified that she had pain in her right leg, butt, spine, hips and sometimes in her arm. AR 339. When asked how long she was able to stand at one time, Dewald said "sometimes not even a minute." Id. She also said that she could not sit that long either. Id. She described how she would sit, like she was sitting during the hearing, on the edge of her chair with her hands underneath her legs, to take the pressure off of her spine, AR 340.

Dewald testified about the stroke she had in 2000. She said she had three of them in July, 2000 and then several little ones after that. Id. She talked about how she drove across a highway intersection after having one of her strokes. AR 349-50. She did not realize what she had done until a man told her. AR 350. She testified that since then, her memory had been affected and she has had to write herself notes to help her remember things. AR 340-41. Even so, she would forget to do things and would put items in the wrong place. AR 341-42.

When asked, Dewald testified that she saw a mental health professional in the 1980's. AR 352. She remembered seeing Dr. Wiemers and was not surprised when the ALJ told her that Dr. Wiemers could not find any memory problems because Dewald "had a great day" when she saw Dr. Wiemers. AR 356.

As part of her daily routine, Dewald testified that she fixed Nickels lunch when she had "a good day." AR 343. She said that she did some housework and that Nickels helped her with whatever she was not able to get done. Id. Nickels bought a dishwasher thinking it would help her, but Dewald said that she could not lean over and load it so dishes were "still all over." Id. In the afternoons, Dewald would usually take a nap because she could

17

not stand the pain all day, but it "hurt worse when I laid down so I stopped taking a nap." AR 344. To [g]et [her] mind working again, Dewald would get on the computer. Id. When asked about this by the ALJ, Dewald said that she used the computer everyday, longer when she was "bad", to "work [her] head more." AR 356. When the ALJ inquired more about her computer usage, Dewald said that she was on the computer for an hour or so each day and that she did things that "make me work my mind." AR 356-57.

V.

A court "must affirm the [C]ommissioner's decision so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoting Collins ex rel Williams v. Barnhart, 335 F.3d 726, 729 (8th Cir. 2003)). "Substantial evidence is that which a 'reasonable mind might accept as adequate to support a conclusion,' whereas substantial evidence on the record as a whole entails 'a more scrutinizing analysis.'" Reed, 399 F.3d at 920 (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)); see also Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998) (noting that the "substantial evidence in the record as a whole" standard is more rigorous than the "substantial evidence" standard). "A court's review 'is more than an examination of the record for the existence of substantial evidence in support of the [C]ommissioner's decision [;] [the court must] also take into account whatever in the record fairly detracts from that decision.'" Reed, 399 F.3d at 920 (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)). "Reversal is not warranted, however, 'merely because substantial evidence would have supported an opposite decision.'" Reed, 399 F.3d at 920 (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)).

18

In applying the second step of the sequential evaluation process used in social security cases, "[o]nly those claimants with slight abnormalities that do not significantly limit any 'basic work activity' can be denied benefits without undertaking" the subsequent steps of the evaluation process. Brown v. Bowen, 827 F.2d 311, 312 (8th Cir. 1987) (quoting Bowen v. Yuckert, 482 U.S. 137, 158 (1987) (O'Connor, J., concurring)). "Great care" should be exercised in applying the second, or "not severe impairment", step of the evaluation process, and if an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the claimant's ability to do basic work activities, the process should not end, but instead, move on to the next step. Gilbert v. Apfel, 175 F.3d 602, 604-05 (8th Cir. 1999).

VI.

Dewald initially claims that additional evidence, submitted by her prior counsel to the appeals council, was not considered and that remand is required. Dewald Br. 14-16. Specifically, she contends that the affidavit of Dr. Jones, executed on June 9, 2007, is material evidence and that the appeals council erred in failing to incorporate the same into the record after receiving it. Id.

In his sworn affidavit, Dewald's prior counsel stated that he had mailed Dr. Jones' affidavit to the appeals council on June 12, 2007. Docket No. 14-2. For whatever reason, the appeals council has no record of ever receiving the same and thus, it is unknown whether the affidavit was inadvertently not mailed or lost in the mail, or accidentally misplaced or excluded from the record. The question now is whether this evidence is new and material, for purposes of determining whether remand is necessary.

19

Sentence six of §405(g) authorizes a court to remand a case to the Commissioner where "new and material evidence is adduced that was for good cause not presented during the administrative proceedings." Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000). Material evidence is "non-cumulative, relevant and probative of the claimant's condition for the time period for which benefits were denied, and there must be a reasonable likelihood that it would have changed the [Commissioner's] determination." Woolf v. Shalala, 3 F.3d 1210, 1215 (8th Cir. 1993).

The Commissioner argues that Dr. Jones' affidavit is not material. The Court disagrees.

At the outset, the affidavit, which discusses Dewald's condition and limitations is not cumulative. The medical evidence, as frequently mentioned in the Commissioner's brief, Commr. Br. 2-7, 12-16, is sparse. In his decision, the ALJ observed that "the only medical source statement in record supporting [Dewald's] allegations of disability comes from Dr. McFee . . . ." AR 295. Dr. Jones' affidavit provides a second medical source opinion from another treating physician. The affidavit is probative and supports the opinion of Dr. McFee, making it relevant to the disability issue. While it is true that the affidavit was signed well after the ALJ's decision was rendered, nonetheless, the affidavit specifically states that Dr. Jones provided care to Dewald on a continuing basis, and by doing so, addresses points raised by the ALJ in his decision about Dewald's failure to seek ongoing care. The affidavit also makes clear that Dewald had unsuccessfully treated for neuropathic pain with a number of different prescribed medications and that she continued to suffer debilitating pain. The affidavit likewise addresses the Commissioner's assertion in his brief that Dewald's bursitis

20

and pain, which she saw Dr. Carlson for, was only a temporary problem. Commr. Br. 13, 15. Although the time frame the affidavit refers to is ambiguous, in a case such as this one where the medical evidence is meager and a non-severe impairment finding has been made, ongoing treatment related to Dewald's condition on or before the date of the ALJ's decision is material. Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000); Williams v. Sullivan, 905 F.2d 214, 216 (8th Cir. 1990).

In addition, it is difficult, if not impossible, to tell, whether Dr. Jones' affidavit would have changed the Commissioner's determination especially given the ALJ's failure to explain and assign weight to the medical opinions that were presented. Without adequately knowing how exactly the ALJ treated these opinions, the Court is unable to ascertain what impact, if any, Dr. Jones' affidavit, and the opinions offered therein, would have had on the ALJ and his decision.

The Court therefore concludes that the case should be remanded for further review and consideration of Dr. Jones' affidavit.[8]

## VII.

Dewald asserts that the Commissioner erred in determining that she did not have a "severe" impairment and in ending the sequential evaluation process at step two. The Court agrees.

---

[8]Remand is warranted under §405(g) because the new evidence (Dr. Jones' affidavit) was presented directly to a reviewing court. Remand may also be warranted because the evidence was submitted to the appeals council (if Dewald's prior counsel's affidavit is believed) and not considered by the council before denying review. See Box v. Shalala, 52 F.3d 168, 171 & n. 4 (8th Cir. 1995); Nelson v. Sullivan, 966 F.2d 363, 366 (8th Cir. 1992).

While Dewald has the burden of showing that her impairment is severe, this burden is not a great one. Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001). The purpose of the "step two" evaluation of impairment severity is to provide a *de minimus* screening device to dispose of groundless claims. Yuckert, 482 U.S. at 153-54. Hudson v. Bowen, 870 F.2d 1392, 1395-96 (8th Cir. 1989). The sequential evaluation process can only be terminated at the step two level when the claimant's impairment or combination of impairments is found to be "not severe" that is, a slight abnormality that would have no more than a minimal impact on the claimant's ability to work. Caviness, 250 F.3d at 605; SSR 96-3p; SSR 85-28. Any doubt as to whether the requisite showing of severity has been made is to be resolved in favor of the claimant. SSR 85-28; see also Newell v. Commissioner of Social Security, 347 F.3d 541, 547 (3d Cir. 2003) (reasonable doubts on severity are to be resolved in favor of the claimant.); Gilbert, 175 F.3d at 605 ("contradictory evidence in the administrative record" did not support the ALJ's decision to stop the sequential analysis at step two).

Having applied the standards and the Commissioner's own regulatory scheme to the instant case, the Court is convinced that the ALJ erred in determining that Dewald did not have severe physical and/or mental impairments and thus had not satisfied the second step of the sequential evaluation process. The ALJ failed to (1) properly evaluate and weigh the opinions of Dewald's treating physicians; (2) properly evaluate her subjective complaints of pain and other symptoms; (3) properly evaluate the findings of the state agency's psychological assessment; and/or (4) properly evaluate her mental impairments.

22

Accordingly, the Commissioner's decision must be reversed and the case remanded for further proceedings pursuant to the fourth sentence of §405(g).

A.

"[A] treating physician's opinion is given 'controlling weight' if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.'" Reed, 399 F.3d at 920 (quoting Dolph v. Barnhart, 308 F.3d 876, 878 (8th Cir. 2002)). An ALJ's decision to discount or even disregard the opinion of a treating physician may be upheld "where other medical assessments 'are supported by better or more thorough medical evidence' or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Reed, 399 F.3d at 921 (quoting Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000)). The ALJ, however, must "always give good reasons" for the weight afforded a treating physician's evaluation. Reed, 399 F.3d at 921 (citing 20 C.F.R. §404.1527(d)(2)); Dolph, 308 F.3d at 878-79. And, the Commissioner's own rules state that even if the objective medical findings are scant, the opinion of a treating physician must still be accorded deference and weighed based on certain specific factors:

> A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight", not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all the factors provided in 20 C.F.R.§§404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

SSR 96-2p (emphasis added).

23

Treating physicians are defined broadly by the regulations as any physician who has provided the claimant with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with the claimant.   20 C.F.R. §§404.1502, 416.902. Generally, more weight is given to the opinion of a treating source who has examined the claimant than to a source who has not. 20 C.F.R. §§404.1527(d)(1), 416.927(d)(1).

1.

The ALJ believed it "questionable" that Dr. McFee was a "treating physician." AR 295-96.  A physician, however, need not provide treatment at all times to be considered a "treating physician." 20 C.F.R. §§404.1502, 416.902; Shontos v. Barnhart, 328 F.3d 418, 425 (8th Cir. 2003).  Dewald did not have the financial ability to pay for medical treatment and only obtained it as a last resort.  AR 73, 97, 102, 108, 120, 245, 253.  Given Dewald's limited financial resources and her mode and history of treatment, it appears that Dr. McFee, who treated her in both hospital and clinic settings, was her "treating physician" at that time. Regardless, there can be little doubt that Dr. McFee was at least an "examining physician" under the Commissioner's regulations and that as such, his opinions were entitled to more weight than nonexamining sources.  20 C.F.R. §§404.1527(d)(1), 416.927(d)(1); Shontos, 328 F.3d at 425.  Whether the ALJ accorded more weight to Dr. McFee's opinions than those who never saw, much less examined her, is unclear.  In fact, as the Commissioner readily acknowledges, the ALJ at no time ever specified what weight he gave to Dr. McFee's opinions.  Commr. Br. at 14, n. 7.

2.

While conceding this point, the Commissioner nonetheless argues that "this was a

24

harmless deficiency in the [ALJ's] opinion-writing technique." Id. The Eighth Circuit has stated that it "will not set aside an administrative finding based on an arguable deficiency in opinion-writing technique. Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004) (citing Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996)). This same rationale has been used in other circumstances where the deficiency in "writing techniques" had no bearing on the outcome of the case. See e.g. Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008); Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992). Such a deficiency, however, cannot be overlooked and reversal and remand is called for when the deficiency relates to material issues that prevent a reviewing court from determining whether an ALJ reached a supportable result via an appropriate analytical pathway. Littlefield v. Astrue, No. 07-72-P-H, 2008 WL 648961 at *2 (D. Me. Mar. 5, 2008) (citing Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999)); see also McFarlin v. Astrue, No. 4:06CV01316 HDY, 2008 WL 615898 at *4 & n. 2 (E.D. Ark. Feb. 29, 2008) (rejecting the Commissioner's argument that flawed credibility analysis was a deficiency in an opinion-writing technique).

As the Commissioner points out, see Commr. Br. at 11-12, medical evidence is vitally important in analyzing the "severity" of an impairment in step two of the sequential evaluation process. Medical evidence from a treating or examining physician is without a doubt important as well. It is for this reason that medical opinions from treating and examining physicians are given deference and at times controlling weight. 20 C.F.R. §§404.1527(d), 416.927(d).

In this case, the ALJ did not explicitly say whether he considered Dr. McFee a treating physician. Although it is implicit that the ALJ did not give controlling weight to Dr.

25

McFee's opinions, the ALJ did not state what weight, if any, he gave to the opinions.

The ALJ does discount Dr. McFee's opinions, but his reasons for doing so are not altogether accurate. For example, the ALJ states that the only impairment found to be present during Dewald's October 2003 hospitalization was a urinary tract infection. Dr. McFee's treatment notes list a number of other diagnoses, in addition to the urinary tract infection. See AR 160.

The ALJ also determined that there were no "objective clinical findings or lab test results" to support Dewald's complaints of back and upper abdominal pain and that none of Dr. McFee's diagnoses were "supported by clinical findings or lab test results." AR 295. These determinations are not consistent with the medical records. See AR 159, 162, 170-78. The ALJ criticizes Dr. McFee's medical source statement (AR 184-85) as being "clearly based on the claimant's allegations to him with no support in his own treatment notes or laboratory test results as well as in other medical evidence in [the] record . . . ." AR 295. As already shown, and contrary to the ALJ's findings, Dr. McFee's opinions in his statement are consistent with his own treatment notes as well as other records (including the limited medical records) on file in this case. Dewald's mental functioning and word choice difficulties are documented by the physicians who examined her and by the state agency psychologist. See AR 159, 184-85, 189, 196, 198-99, 245, 259. Moreover, the possibility of neuropsychological problems is shown in Dewald's performance on the Trails B test and the consulting psychologist's recommendation that a further assessment be conducted. AR 198-99. In addition, x-rays taken in 2003 and 2004 showed degenerative changes, AR 159, 250 which could account for Dewald's back and leg pain. Further, during her examination,

26

Dr. Wiemers observed behavior consistent with pain and indicated in her report that if there was not a clear medical cause for the pain, then somatization should be considered. AR 198-99.

The Commissioner maintains that the ALJ properly discounted Dr. McFee's opinions. Commr. Br. at 14. But because the ALJ did not say what weight, if any, he gave to Dr. McFee's opinions, there is no way to definitively assess whether the opinions were properly discounted. And, the fact that the opinions of a physician are not entitled to controlling weight (even an implicit finding to this effect as the Commissioner now contends), does not mean that the opinion should be rejected altogether; rather, they must still be given deference and properly weighed. SSR 96-2p.

3.

There is no mention whatsoever in the ALJ's decision as to whether Dr. Jones was considered a treating or examining source. AR 296-97. Nor is there any indication in the decision what weight the ALJ gave to Dr. Jones' opinions. Id. The ALJ did generally describe the treatment Dewald received from Dr. Jones, but said very little about Dr. Jones' opinions other than to critique the need for a pelvic x-ray when the stated reason for ordering the exam was "low back and hip pain, rectal pain." AR 254, 296.

In his discussion of Dewald's September 2004 hospitalization, the ALJ states that her failure to seek medical treatment for almost a year and the use of only "minimal over-the-counter" pain medication were "highly inconsistent with, and unsupportive of, her allegations of debilitation and pain." AR 296. The ALJ, however, does not mention or even address Dewald's financial limitations and historical reluctance to obtain treatment. See AR 73, 97,

27

102, 108, 120, 245, 253. And, when Dr. Jones examined Dewald, he found her to be "quite tender to palpation along the paraspinous musculature especially laterally . . . toward [ ] the left sacroiliac joint", AR 246, made reference to episodes where she was confused and had trouble "making words, etc.", AR 245, noted that lumbar spine x-rays "showed partial narrowing of the T-11 vertebral body of indeterminate age and some degenerative changes", AR 244, and prescribed a number of medications including an anti-depressant, a muscle relaxant and at least two different pain relievers. Id. Significantly, upon her discharge from the hospital, Dewald reported that her pain "had markedly improved" and was "under control." Id.

In any event, Dr. Jones' June 9, 2007 affidavit, which the ALJ did not consider, establishes Dr. Jones as a "treating physician" whose medical opinions, including those relating to the severity of her impairment, were entitled to be weighed in her favor, see 20 C.F.R. §§404.1527(d)(2), 416.927(d)(2), something that was not done. Whether Dr. Jones' opinions should be given "controlling weight" or not, given the circumstances present, is a matter that should be dealt with on remand.

4.

In his decision, the ALJ did state that he gave no weight to Dr. Carlson's "bilateral trochanteric bursitis" diagnosis. AR 297. The reasons given for this were: (1) lab test results did not show "an abnormal sedimentation rate or any chemistry result that would account for [Dewald's] allegations of pain; (2) "two different x-rays of [her] hips and sacroiliac joints were previously reported as entirely normal"; and (3) because the MRI (ordered by Dr. Carlson) had not been produced, it could be inferred that the same "would also show no

28

abnormality." AR 297. The ALJ, however, ignored or at least discounted the fact that Dewald had a prior lumbar spine x-ray which was not entirely normal. AR 250. He also failed to take into account that none of the state agency experts saw Dr. Carlson's records or diagnosis and there was no medical evidence to refute the same. It appears that the ALJ, on his own, concluded that Dewald's prior lab test results and unremarkable pelvic x-rays ruled out, or militated against, Dr. Carlson's diagnosis of bilateral trochanteric bursitis. Dr. Carlson's diagnosis, which he made after examining Dewald, was unequivocal: "She does have trochanteric bursitis on the right and left sides and these will be injected today." AR 270. Significantly, his diagnosis was made prior to and without any review of lab or MRI results, id., and lab tests did ultimately show abnormal results for MCH and PLT, AR 276. And, even if MRI results were required to support or confirm a diagnosis of trochanteric bursitis, the ALJ should have requested the results or sought clarification from Dr. Carlson (as opposed to totally discounting his diagnosis). See 20 C.F.R. §§404.1512(e), 416.912(e); see also Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) (ALJ has duty to neutrally develop the facts and seek clarification on crucial issues); Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (it is the duty of the ALJ to fully and fairly develop the record, even when the claimant is represented by counsel).

The Commissioner's contention that "bursitis is typically a short-term ailment", Commr. Br. at 13, 15, is unsupported by any authority whatsoever. There is no evidence of record that Dewald's trochanteric bursitis was a temporary condition and a cursory review of medical resources reveals that the condition can be chronic in older women. See Wikipedia – Trochanteric bursitis, http://www.en.wikipedia.org/wiki/Trochanter_bursitis

29

(this bursitis "is most common in middle aged women and is associated with a chronic and debilitating pain which does not respond to conservative treatment"); Shbeeb MI and Matteson EL, <u>Trochanteric bursitis (greater trochanteric pain syndrome), Mayo Clin Proc.</u> (1996); 71(6): 565-9, http://medscape.com/medline/abstract/8642885?src=emed_ckb_ref_o (a common regional pain syndrome "characterized by chronic, intermittent aching pain over the lateral aspect of the hip"). In Dewald's case, it is no more or less speculative to say that her bursitis was a temporary, short-term condition than it is to say that the bursitis was chronic in nature and wholly consistent with the pain she reported having in her hip area and elsewhere, for several years.

B.

When evaluating a claimant's subjective complaints of pain, an ALJ must consider the claimant's prior work record, observations by third parties and treating and examining physicians relating to such matters as (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side affects of medication; and (5) functional restrictions. <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ may discount subjective complaints of pain if inconsistencies are apparent in the evidence as a whole. <u>Id</u>.

While an ALJ need not explicitly discuss each <u>Polaski</u> factor, <u>Goff v. Barnhart</u>, 421 F.3d 785, 791 (8th Cir. 2005), if the claimant's subjective complaints are rejected, the ALJ "must make an express credibility determination explaining the reasons for discrediting the complaints," <u>Wagner v. Astrue</u>, 499 F.3d 842, 851 (8th Cir. 2007) (quoting <u>Singh v. Apfel</u>, 222 F.3d 448, 452 (8th Cir. 2000)). In doing so, the ALJ must acknowledge and consider the

30

<u>Polaski</u> factors before discounting the claimant's subjective complaints. <u>Goff</u>, 421 F.3d at 791-92 (citing <u>Strongson</u>, 361 F.3d at 1072).

The ALJ's decision included an express credibility determination that Dewald's "statements in record and testimony . . . as to the presence and severity of any alleged impairment, including pain, is found highly exaggerated, generally not credible and not substantially supported by medical evidence and opinion in record . . . ." AR 295. The decision, however, does not set forth, acknowledge or apply the <u>Polaski</u> factors or its framework.

The Commissioner nonetheless claims that the factors are discussed "throughout" the ALJ's decision. Commr. Br. at 21. The third party observations of Dewald's "highly limited" daily activities were accepted by the ALJ as "credible." AR 295. There is no discussion in the decision at all of Dewald's daily activities other than a brief note that she had "limited her performance of daily activities for several years to essentially the sedentary to light exertional level." AR 298. The record indicates that Dewald is and has been dependent on Nickels to assist her with a wide variety of tasks and to watch over and check up on her. AR 341-45, 349-50.

There is little, if any, discussion in the ALJ's decision about the duration, frequency or intensity of Dewald's pain and precipitating and aggravating factors. The ALJ did recognize that she "may well [have] experience[d] some degree of functional limitation due to deconditioning" but refused to acknowledge that such a limitation was a "recognizable basis upon which to premise a claim for disability benefits." AR 298. Although the ALJ's

31

discussion of her work history was limited, he did acknowledge that prior to her strokes in 2000, she engaged in SGA at the "light to heavy exertional levels." Id.

The ALJ did address Dewald's medical treatment history and appears to have based his credibility finding primarily on this factor. AR 295-99. As already indicated, the ALJ's findings and discussion of Dewald's treatment and diagnoses, especially as to what impairments she had, what was diagnosed, and what objective clinical findings supported them, are flawed. In addition, the ALJ should have discussed Dewald's financial inability to afford treatment as well as her historical disposition when obtaining medical care before making a credibility determination based on gaps in treatment or lack of continuity of care. See Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004) (lack of sufficient financial resources may be a justifiable cause for non-compliance). Tome v. Schweiker, 724 F.2d 711, 714 (8th Cir. 1984) (lack of resources may be an independent basis for finding justifiable cause for noncompliance); but see Berstrom v. Astrue, No. Civ. 07-5032-KES, 2008 WL 2572600 at *8 & n.3 (D.S.D. June 25, 2008) (distinguishing Tome).

The record reveals that Dewald resisted medical care and treatment because of her financial limitations and only sought treatment when the situation was desperate and she had to. See AR 73, 97, 102, 108, 120, 196, 198, 245, 253. The ALJ should have explored, or at least considered, these factors before discrediting her subjective complaints, but for whatever reason, did not do so.

The ALJ's failure to acknowledge and apply the factors and standards set forth in Polaski, before discounting Dewald's subjective complaints, amounted to error.

C.

Dewald argues that the ALJ failed to give any weight to the state agency's psychological examination to the extent that the same would suggest that she would have a somatoform disorder. The Commissioner concedes that this disorder was no where discussed in the ALJ's decision, but insists that this does not matter. Commr. Br. at 18-19. The Court does not concur.

A somatoform disorder causes a person to believe, outside her control, that her physical ailments are more serious that clinical data would suggest. Easter v. Bowen, 867 F.2d 1128, 1129 (8th Cir. 1989). Shortcomings in the objective medical data incident to alleged physical ailments are irrelevant since the disorder causes such a person to exaggerate her physical problems in her mind beyond what such data would indicate. Easter, 867 F.2d at 1130. An ALJ, therefore, should consider the impact of a somatoform disorder before he discredits a claimant's subjective complaints.

Somatoform and personality disorders were included as secondary diagnoses in the two state disability determinations. AR 26-27. These diagnoses were based on the examination conducted by Dr. Wiemers. AR 198-99. In her psychological assessment, Dr. Wiemers concluded that it was unclear to her whether Dewald's symptoms, which included tangential communication style and word finding problems, were related to emotional or personality disorder issues or neurological problems. AR 199.

The ALJ expressly concluded that there was no organic basis established in the record to medically support Dewald's allegations of abdominal pain. AR 295. The ALJ also agreed with and adopted the opinions of the state agency physicians that Dewald did not have a

33

"severe" physical impairment. AR 298. Yet the two state agency physicians noted Dr. Wiemers' reference to somatoform disorder in their assessments. AR 215, 219, 237, 241. Both psychiatric review technique forms completed by non-examining sources also made reference to this disorder. AR 200, 206, 212, 222, 228, 234.

The ALJ should have considered the impact of a somatoform disorder when determining Dewald's credibility and whether she had a "severe" impairment within the meaning of the Social Security Act. His failure to do so, or to even mention the disorder in his decision, was error.

### D.

The Commissioner maintains that the ALJ considered all of Dewald's mental health symptoms and opinion evidence in accordance with the Commissioner's regulations and Social Security rulings. Commr. Br. at 16. The Court, however, takes issue with this.

Under the Commissioner's regulations, the degree of mental impairment is evaluated in four functional areas: Activities of daily living; social functioning; concentration, persistence or pace; and episodes of decomposition. 20 C.F.R. §§404.1520a, 416.920a. The regulations state that "If we rate the degree of your limitation in the first three functional areas at 'none' or 'mild' and 'none' in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities . . . ." §§404.1520a(d)(1), 416.920a(d)(1). The regulations not only establish a basic rule and an exception to it, but also clearly indicate that a non-severe finding is not proper when any of these functional areas are determined to be other than "none" or "mild" (such as "moderate", "marked" or

34

"extreme") or when episodes of decomposition are indicated in the fourth area.

Drs. McFee, Jones and Hagge all observed problems with Dewald's mentation. AR 159, 184-85, 189, 245, 259-60. All three doctors examined and treated Dewald.

Dr. Wiemers, who also examined Dewald, noted tangential or rambling speech and significant difficulty finding words. AR 196. Dr. Wiemers indicated that she was not sure whether these problems were due to emotional, personality disorders or neurological problems, but she was clear that the problems did in fact exist. AR 199.

The observations of four health professionals were consistent with each other, were observed over an extended period of time and involved communication difficulties. Difficulties in communication can be a real impairment that limits a claimant's employment opportunities. See Jones v. Barnhart, 335 F.3d 697, 701 (8th Cir. 2003). Aside from this, Dr. Wiemers recommended a further neuropsychological assessment based on the results of the Trails B test. If Dewald's mental impairment was nothing more than a slight abnormality, that had no more than a minimal impact on her ability to do basic work activities, why would Dr. Wiemers recommend such an assessment? If Dr. Wiemers was not sure of the cause of Dewald's symptoms, but believed the results from the Trails B test suggested a "neuropsychological component that may consequate into a disability", how was the ALJ able to discern that a severe mental impairment did in fact not exist?

The Commissioner's regulations state "when we evaluate the severity of mental impairments for adults . . . we must follow a special technique at each level in the administrative review process." 20 C.F.R. §§404.1520a(a), 416.920a(a). Using this technique helps to (1) identify the need for additional evidence to determine impairment

35

severity; (2) consider and evaluate functional consequences of the mental disorder(s) relevant to the ability to work; and (3) organize and present findings in a clear, concise and consistent manner. Id. The technique must be conducted at all levels, including the ALJ and appeals council levels, but it is permissible, at these levels, to include the analysis within the written decision. Nicola v. Astrue, 480 F.3d 885, 887 (8th Cir. 2007).

The ALJ did not employ this technique either separately or within his decision. Consequently, the ALJ did not address, or even acknowledge, the somatization disorder referred to in Dr. Wiemers' assessment. The Commissioner contends that this was implicitly done by the ALJ's adoption of the state agency non-examining opinions. Commr. Br. at 18-19. The two state agency reports, which mirror each other, make passing reference to this disorder, without any discussion, but fail to even mention the consistently observed communication problems, impaired score on the Trails B test or Dr. Wiemers' recommendation for a further neuropsychological assessment. AR 200-10, 222-34.

The Commissioner concedes in his brief that based on the state agency findings of mild impairments and concentration, persistence and pace and "one or two" episodes of decomposition[9], his own regulations would generally support a finding of severe mental impairment. Commr. Br. at 19. The Commissioner, however, argues that the rule in §404.1520a(d)(1) (and presumably §416.920a(d)(1) as well) is only a "general rule" and need not be applied in all cases, yet cites no authority to support his argument. Id. He maintains

---

[9]There are at least three hospitalizations documented in the record, AR 159-81, 190-91 and 244-45, each of which could constitute an episode of decomposition. There is also other evidence of record, which could likewise indicate episodes of decomposition. AR 66 (sometimes cannot lift a plate); AR 68, 92 (blacked out), AR 196, 356 (have good days and bad days).

36

that the state agency reports were sufficient to support the ALJ's determination that Dewald's impairments were non-severe. Commr. Br. at 19-20. As already indicated, these reports contain serious deficiencies, and fail to even mention issues raised by the only psychologist who ever examined and tested Dewald.

Having reviewed the record in its entirety, the Court believes that the Commissioner failed to properly evaluate Dewald's mental impairments. Remand, therefore, is necessary so that this can be done.

## VIII.

At the step two "severity" level of the sequential evaluation process, the benefit of the doubt, where there is conflicting or unclear evidence, is given to the claimant. Gilbert, 175 F.3d at 604-05; see also SSR 85-28 (stating that unless the adjudicator is able to determine clearly the effect of an impairment on an individual's ability to do basic work activities, the sequential evaluation process should continue). The issue, at this point, is not whether Dewald will ultimately be found disabled and qualify for benefits, but rather whether she has met her burden at the second step of the sequential process and is therefore entitled to a more complete evaluation of her claim. On this record, the Court cannot say that the ALJ "clearly [and correctly] determined" that no severe impairment or combination of impairments existed so as to end this process without going further.

For the reasons stated herein, and based on the entirety of the record, it is hereby

RECOMMENDED that Dewald's Motion for Summary Judgment, Docket No. 12, be granted insofar as the same seeks reversal of the Commissioner's decision and remand of the case for further development and evaluation under the fourth sentence of §405(g).

Buckner, 213 F.3d at 1010; Eberlan v. Astrue, No. CIV. 06-4136, 2008 WL 565185 at **1, 22 (D.S.D. Feb. 29, 2008).  It is further

RECOMMENDED that on  remand, the Commissioner be directed to: (1) properly evaluate the opinions of Dewald's medical providers; (2) reassess Dewald's testimony and credibility in light of her mental impairments; (3) further develop the record with additional consultative examinations and testing; and (4) issue a new decision based on substantial evidence of the record as a whole, based on relevant legal standards.

Dated this **20** day of October, 2008, at Pierre, South Dakota.

**BY THE COURT:**

**MARK A. MORENO**
**UNITED STATES MAGISTRATE JUDGE**

ATTEST:
JOSEPH HAAS, CLERK
BY:                        
(SEAL)            /Deputy

## NOTICE

Failure to file written objections to the within and foregoing Report and Recommendations for Disposition within ten (10) days from the date of service shall bar an aggrieved party from attacking such Report and Recommendations before the assigned United States District Judge.  See 28 U.S.C. §636(b)(1).